Peter E. **STOECKINGER**, Appellant

v.

**PRESIDENTIAL FINANCIAL COR-
PORATION OF DELAWARE
VALLEY, Appellee.**

Superior Court of Pennsylvania.

Argued March 18, 2008.

Filed May 5, 2008.

8. Counsel for Appellant agreed with the trial court's analysis at trial. N.T., 8/24/05, at 153–154.

Robert J. Colaizzi, Pittsburgh, for appellant.

Jerrold S. Kulback, Haddonfield, NJ, for appellee.

BEFORE: BENDER, BOWES and TAMILIA, JJ.

OPINION BY BENDER, J.:

¶ 1 Peter E. Stoeckinger appeals from the order granting the motion for summary judgment filed by Presidential Financial Corporation of Delaware Valley in Stoeckinger's action against Presidential for unjust enrichment and tortious interference with contract. Stoeckinger argues that the trial court erred in determining that his claims were barred by *res judicata* due to a prior bankruptcy proceeding involving the parties herein. For the following reasons, we affirm.

¶ 2 The material facts are not disputed. This case arises from the nonpayment of loans that each party extended to Sol-9 Development, Inc. On or about December 13, 2001, Presidential extended to Sol-9 a loan in an amount up to seventy-seven percent of Sol-9's "Approved Receivables" with a maximum limit of $100,000. Supplemental Reproduced Record (S.R.) at 10b. The loan agreement defined Approved Receivables as, "such accounts, contract rights, chattel paper, instruments, or general intangibles belonging to [Sol-9] as from time to time shall be acceptable to [Presidential], in its sole judgment and discretion, in terms of quality and current status." *Id.* Pursuant to the terms of the

loan agreement, Sol–9 granted Presidential a security interest in *all* of Sol–9's receivables. *Id.* Thus, while the loan permitted Sol–9 to draw on the loan up to seventy-seven percent of its Approved Receivables, the security for the loan included all of Sol–9's receivables and not just the Approved Receivables. On December 4, 2001, Presidential recorded its security interest in all of Sol–9's receivables by filing a UCC–1 Financing Statement with the Pennsylvania Department of State. *Id.* at 30b.

¶ 3 Sometime around August of 2003, Sol–9 sought to draw on the loan based upon a receivable owed by the United States Coast Guard (USCG) in the amount of approximately $44,000. Reproduced Record (R.) at 51. Presidential refused to approve the USCG receivable, and therefore, it did not permit Sol–9 to make a draw on the loan. Presidential informed Sol–9 that it would not permit Sol–9 to make a draw based upon the USCG receivable because it was against Presidential's policy to approve such receivables, as they require substantial paperwork to collect.

¶ 4 On or about October 1, 2003, Sol–9 was having cash flow problems, and therefore, it turned to Stoeckinger for a loan. R. at 11, 13. Stoeckinger agreed to loan $42,356.19 to Sol–9, and as part of this loan agreement, he took a security interest in the USCG receivable. Presidential was apprised of the loan between Sol–9 and Stoeckinger and the fact that Sol–9 granted a security interest in the USCG receivable to Stoeckinger as part of the loan agreement.

¶ 5 On or about April 16, 2004, Sol–9 filed for bankruptcy. S.R. at 53b. The USCG receivable was listed in Sol–9's bankruptcy petition as one of its assets. S.R. at 58b. Stoeckinger was listed on the petition as an unsecured creditor holding a nonpriority claim. *Id.* at 67b. On June 22, 2004, Presidential filed a motion in the bankruptcy proceeding seeking an order that would allow it to collect the USCG receivable. S.R. at 87b. Counsel appeared on behalf of Stoeckinger, and argued against the motion, claiming that Stoeckinger had a security interest in the USCG receivable which entitled him to collect the USCG rather than Presidential. S.R. 114b–116b. This argument was summarily dismissed by the bankruptcy court with the advice to Stoeckinger's counsel that this was not "a battle worth having." S.R. at 116b. Accordingly, the bankruptcy court entered an order permitting Presidential to collect the USCG receivable, as its security interest had priority over Stoeckinger's security interest. *Id.*

¶ 6 Undeterred, on or about May 16, 2005, Stoeckinger brought the underlying action against Presidential in the Court of Common Pleas, asserting causes of action for unjust enrichment and tortious interference with contract. After discovery, Presidential filed a motion for summary judgment on the bases of *res judicata* and because, as a matter of law, Stoeckinger could not sustain the claims for unjust enrichment nor tortious interference with contract. On November 9, 2006, the court issued an order granting the motion and stating that Presidential had a first lien security interest, that the USCG receivable was subject to this security interest pursuant to the bankruptcy court's decision, and that Stoeckinger had failed to adequately secure his loan. Appellant then filed this appeal raising the following question for our review:

Did the trial court commit an error of law and/or abuse of discretion in granting the Motion for Summary Judgment of the Defendant/Appellee, Presidential Financial Corporation, based upon the

doctrine of Res Judicata as to all claims set forth in the Complaint?

Brief for Appellant at 3.

■ ¶ 7 Pursuant to Pa.R.C.P. 1035.2, summary judgment is appropriate where "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action ... which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(1). "In reviewing this matter, as with all summary judgment cases, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Ertel v. Patriot–News Co.*, 544 Pa. 93, 674 A.2d 1038, 1041 (1996). However, "failure of a non-moving party to adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict in its favor establishes the entitlement of the moving party to judgment as a matter of law." *Young v. Com. Dept. of Transp.*, 560 Pa. 373, 744 A.2d 1276, 1277 (2000).

¶ 8 The doctrine of *res judicata* has been explained as follows:

Under the doctrine of res judicata issue preclusion [Fn.2], when an issue of fact or of law is actually litigated and determined by a valid final judgment, and determination of the issue was essential to judgment, the determination on that issue is conclusive in a subsequent action between the parties, whether on the same or a different claim. As we have noted in our cases, issue preclusion serves the twin purposes of protecting litigants from assuming the burden of re-litigating the same issue with the same party, and promoting judicial economy through preventing needless litigation.

[FN.2] "Res judicata" means "a thing adjudged" or a matter settled by judgment. Traditionally, American courts have used the term res judicata to indicate claim preclusion, i.e., the rule that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and constitutes for them an absolute bar to a subsequent action involving the same claim, demand or cause of action. This is distinguished from the traditional doctrine of collateral estoppel, or issue preclusion, which holds that when a particular issue has already been litigated, further action on the same issue is barred. We have interpreted the "modern doctrine of res judicata" as incorporating both claim preclusion, or traditional res judicata, and issue preclusion, or traditional collateral estoppel.

*McNeil v. Owens–Corning Fiberglas Corp.*, 545 Pa. 209, 680 A.2d 1145, 1147–48 (1996) (citation omitted). Application of the doctrine of res judicata as an absolute bar to a subsequent action requires that the two actions possess the following common elements: "(1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity of the parties; (4) identity of the capacity of the parties." *Dempsey v. Cessna Aircraft Co.*, 439 Pa.Super. 172, 653 A.2d 679, 681 (1995) (*en banc*).

■ ¶ 9 Applying this doctrine to the facts of this case, we reach a mixed result. First, we consider whether *res judicata* is an absolute bar to Stoeckinger's actions against Presidential. The USCG receivable was the object of Presidential's motion before the bankruptcy court and Stoeckinger's objection to the motion. They both appeared before the bankruptcy court, each asserting their competing interest in the USCG receivable. Thus, when we compare the bankruptcy proceeding to the instant case, we conclude that the first, third and fourth elements are met.

¶ 10 However, the causes of action of unjust enrichment and tortious interference with contract in the underlying case are different than the one before the bankruptcy court. Clearly, the bankruptcy

court never considered whether Stoeckinger was entitled to relief on either of these claims. Therefore, since the causes of action are not identical, we find that the second element is lacking. Consequently, *res judicata* does not operate as *an absolute bar* to Stoeckinger's causes of action.

■ ¶ 11 This does not end our inquiry because as we stated above, the doctrine of *res judicata* also includes collateral estoppel or issue preclusion. Since the bankruptcy court has finally adjudged the priority of the liens and the propriety of Presidential's collecting the USCG receivable pursuant to its security interest in *all* of Sol–9's receivables, Stoeckinger was collaterally estopped from relitigating this issue in the Court of Common Pleas. *See John T. Gallaher Timber Transfer v. Hamilton,* 932 A.2d 963, 967 (Pa.Super.2007) (stating that "collateral estoppel prevents a question of law or an issue of fact which has once been litigated and adjudicated finally in a court of competent jurisdiction from being relitigated in a subsequent suit") (quotation marks omitted). As we shall explain *infra,* the fact that Presidential was entitled to collect the USCG receivable in accordance with its security interest is fatal to both of Stoeckinger's causes of action.

■ ¶ 12 We begin with Appellant's cause of action for unjust enrichment. A claim for unjust enrichment arises from a quasi-contract. "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *AmeriPro Search, Inc. v. Fleming Steel Co.,* 787 A.2d 988, 991 (Pa.Super.2001).

The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is *unjust.* The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. *Styer v. Hugo,* 422 Pa.Super. 262, 619 A.2d 347, 350 (1993) (quotation marks omitted). The crux of Stoeckinger's claim against Presidential is that it "had full knowledge that [Sol–9] was entering into the loan agreement with [Stoeckinger] on October 1, 2003, and [Presidential] did nothing to stop [Sol–9] from entering the said agreement." Brief for Appellant at 21. It is this purported unjustness that Stoeckinger has sought to remedy in its claim for unjust enrichment.

¶ 13 We begin with the elementary observation that Presidential simply acted to collect money that it had loaned Sol–9. Presidential received no undue benefit through this action. In point of fact, had Presidential not been permitted to collect the money it had loaned Sol–9, it would have suffered a pecuniary loss. Furthermore, pursuant to the bankruptcy court's decision, and as a simple matter of law, Presidential was a secured creditor with priority over Stoeckinger's security interest in the USCG receivable. Stoeckinger's folly in accepting the USCG receivable as collateral, when Presidential possessed a recorded security interest in the USCG receivable, was a complete abdication of due diligence in its decision to make a loan to Sol–9. Contrary to Stoeckinger's assertion, Presidential certainly had no duty to advise Stoeckinger against making such a

834

loan, and it had no authority to prevent Sol–9 from entering into such a loan agreement.

¶ 14 Furthermore, we conclude that it is of no moment that Sol–9 submitted the USCG receivable to Presidential for approval in an effort to make a draw on its loan with Presidential, but was denied. Presidential was entirely within its rights to decline to loan Sol–9 further sums unless Sol–9 submitted receivables that Presidential deemed worthy of approval. Indeed, it was prudent for Presidential to maintain this policy, as it insulated Presidential from loaning money to Sol–9 based upon receivables with a less than favorable likelihood of collection. Moreover, Presidential's decision not to approve the USCG receivable in no way operated to diminish its security interest in the USCG receivable, for Presidential's security interest covered all of Sol–9's receivables. Had Stoeckinger performed even a cursory review of the loan agreement between Sol–9 and Presidential or Presidential's UCC1 Financing Statement, it would have become immediately apparent that the best Sol–9 could offer Stoeckinger was a security interest in the USCG receivable that was junior to that of Presidential. Therefore, we conclude that as a matter of law, Stoeckinger has failed to show that Presidential's collection of the USCG receivable was unjust. This failure alone is fatal to Stoeckinger's claim for unjust enrichment.

¶ 15 Next, we address Stoeckinger's claim for tortious interference with contract, the elements of which are as follows:

(1) the existence of a contractual relationship between the plaintiff and a third party;

(2) purposeful action on the part of the defendant intended to harm the relationship;

(3) the absence of privilege or justification on the part of the defendant; and

(4) actual damages resulting from the defendant's conduct.

*Hillis Adjustment Agency, Inc. v. Graham Co.*, 911 A.2d 1008, 1012 (Pa.Super.2006).

¶ 16 In the instant case, for all the reasons discussed above, Stoeckinger has failed to show that Presidential was not justified in collecting the USCG receivable. Consequently, having failed to show, as a matter of law, that Presidential's actions were unjustified, Stoeckinger cannot establish the third element of a claim for tortious interference with contract.

¶ 17 Order affirmed.